James WILLIAMS et al., Plaintiffs,
United States of America,
Plaintiff-Intervenor,

v.

IBERVILLE PARISH SCHOOL BOARD
et al., Defendant.

Alexander CARTER, Jr., et al.

v.

Sam DISTEFANO, Individually, and as
Superintendent of Iberville Parish
Schools, et al.

Civ. A. Nos. 2921, 70-51.

United States District Court,
E. D. Louisiana,
Baton Rouge Division.

June 30, 1970.

———◆———

Patrick Hardin, Civil Rights Division, Dept. of Justice, New Orleans, La., for government.

John F. Ward, Jr., Jack P. F. Gremillion, Atty. Gen. of Louisiana, Baton Rouge, La., Samuel Cashio, Maringouin, La., for defendants.

Gibson Tucker, Jr., New Orleans, La., for plaintiffs in Edley v. Iberville Parish School Board in Eighteenth Judicial District Court.

A. P. Tureaud, New Orleans, La., Alfred E. Mitchell, Plaquemine, La., Norman Chachkin, New York City, for plaintiffs.

WEST, Chief Judge:

These consolidated actions grew out of the difficult task of converting the Iberville Parish School system from a dual system to a non-discriminatory unitary system. They involve complaints by two of the plaintiffs, Mr. Arnett D. James, Jr. and Mr. Wendol O. Williams, concerning their transfer and re-assignment by the School Board from positions of "principal" to newly created positions of "coordinating principals." Succinctly stated, Mr. James and Mr. Williams contend that they have been "demoted" because they are members of the Negro race, while the defendant School Board contends that they have been promoted to more meaningful positions because of their superior ability to fill these newly created positions.

An evidentiary hearing was held before this Court on April 6, 1970, at which time over two hundred pages of testimony was taken. While other issues were possibly raised by the pleadings, it was agreed between Court and counsel that only the above delineated issues were at this time before the Court. Briefly, the testimony shows the facts to be as follows.

For several years now the Iberville Parish School Board has been operating its public school system under various plans approved by and imposed upon them by the Federal Courts. It would serve no useful purpose to go into the details of the various plans and orders that have been imposed upon this school system over the past several years. Suffice it to say that in July of 1969, pursuant to a mandate issued by the United States Circuit Court of Appeals for the Fifth Circuit, this Court ordered the defendant School Board to implement a

plan for total desegregation of the schools which would be in complete effect by the beginning of the school year in September 1970. Thereafter, on January 27, 1970, pursuant to further mandate, this Court issued a new order requiring the complete desegregation plan to be fully implemented by February 1, 1970. The ordered plan was, of course, implemented on February 1, 1970, and in the course of its implementation, re-assignment of many students and some faculty members was required.

Prior to these re-assignments, plaintiff, Mr. Arnett Douglas James, Jr., a member of the Negro race, was principal of Sunshine High School. He had been in the Iberville Parish school system as a teacher for some sixteen years and he had been principal at Sunshine High School for five and one-half years. Sunshine was, before implementation of the new desegregation plan, an all-Negro high school. The other plaintiff, Mr. Wendol O. Williams, had been in the system as a teacher for thirty-five years, and was, at the time of his re-assignment, principal of Iberville High School. Effective February 1, 1970, Mr. James was re-assigned from the position of principal of Sunshine High School to the newly created position of coordinating principal over the Sunshine and St. Gabriel schools and Mr. Williams was re-assigned from his position of principal of Iberville High School to the newly created position of coordinating principal over Iberville High School and Plaquemine High School.

The creation of these new positions had been under consideration by the School Board for at least a year prior to their actual creation. They were officially provided for in the desegregation plan ordered by the Court on July 25, 1969. It was at that time expected that these positions would not be filled until the final phase of desegregation was implemented in September 1970. This is what both Mr. James and Mr. Williams expected as far back as July or August 1969. But the revised Court order of January 27, 1970, changed all that. It required the final phase of the desegregation plan to be implemented on February 1, 1970. Consequently, the re-assignment of Mr. James and Mr. Williams was advanced to that date. One of the unfortunate results of the Court's newly advanced deadlines was the inability of the School Board, due to the short noticed, unexpected advance in the deadline date, to properly outline by February 1, 1970, the exact duties and responsibilities of the newly created positions of coordinating principals, and to properly provide, by February 1, 1970, the necessary space, equipment and personnel which they knew would ultimately be required for these positions. But in any event, the positions were formally established on February 1, 1970, and on that date Mr. James and Mr. Williams were assigned to fill those positions, even though their offices were inadequately equipped, and their duties and responsibilities were not clearly defined.

The fact that Mr. James and Mr. Williams were the only Negro principals in the school system, and the fact that they were replaced by white principals does, of course, make the re-assignments immediately suspect. But the totality of evidence in this case does not, at this point, justify a conclusion that these re-assignments of Mr. James and Mr. Williams were discriminatory "demotions" as contemplated by the prohibitory provisions of the Court decree under which this school system was being operated. Indeed, at this stage of the proceedings, a conclusion that the re-assignments amounted to a "demotion" would be unwarranted.

In connection with the dismissal or demotion of faculty and staff members, the Court's order of December 16, 1969, [taken directly from the mandate included in Singleton v. Jackson Municipal Separate School District, 419 F.2d 1211 (CA 5—1969)] provided:

"If there is to be a reduction in the number of principals, teachers, teacher-aides, or other professional staff employed by the school district which will result in a dismissal or demotion of

any such staff members, the staff member to be dismissed or demoted must be selected on the basis of objective and reasonable non-discriminatory standards from among all the staff of the school district. In addition if there is any such dismissal or demotion, no staff vacancy may be filled through recruitment of a person of a race, color, or national origin different from that of the individual dismissed or demoted, until each displaced staff member who is qualified has had an opportunity to fill the vacancy and has failed to accept an offer to do so.

Prior to such a reduction, the school board will develop or require the development of non-racial objective criteria to be used in selecting the staff member who is to be dismissed or demoted. These criteria shall be available for public inspection and shall be retained by the school district. The school district also shall record and preserve the evaluation of staff members under the criteria. Such evaluation shall be made available upon request to the dismissed or demoted employee.

'Demotion' as used above includes any re-assignment (1) under which the staff member receives less pay or has less responsibility than under the assignment he held previously, (2) which requires a lesser degree of skill than did the assignment he held previously, or (3) under which the staff member is asked to teach a subject or grade other than one for which he is certified or for which he has had substantial experience within a reasonably current period. In general and depending upon the subject matter involved, five years is such a reasonable period."

The evidence in this case simply does not justify a conclusion at this time that Mr. James and Mr. Williams were "demoted." According to the testimony adduced at the hearing before this Court, the newly created positions of coordinating principal will be far from a demotion from that of principal if the appointees to those positions are assigned the duties outlined in the School Board's Circular No. 38, adopted and issued by the School Board on March 23, 1970. That circular, a copy of which was filed in evidence, sets forth the duties and responsibilities of coordinating principals as follows:

"1. Act as liaison person between schools.

2. Assist Negro and white teachers and students adjust to the transition from a dual to a unitary school system.

3. Act as intermediary between communities and schools.

4. Assist in scheduling of students.

5. Help to alleviate drop-out problems and follow up students.

6. Follow up on chronic absenteeism of students and identify cause and suggest solutions.

7. Coordinate students who attend other schools for special classes such as trade school.

8. Arrange and conduct in-service training programs between school faculties through faculty meetings, in-depth curriculum studies, innovations, and individualized instruction.

9. Coordinating extra curriculum activities between schools in same areas, including athletics, field trips, festivals and programs.

10. Participate with central office personnel in organizing, conducting and carrying out dynamic classroom supervision.

11. Making recommendations related to employment of professional personnel.

12. Develop uniform and consistent policies, procedures and regulations for schools located in the same attendance area.

13. Help select teaching materials especially in the new area of multi-ethnic subjects.

14. Assist central office in conducting special activities and programs such as: National Education Week, Teacher Appreciation

Week, Career Days, Essay Contests, and patriotic activities.

The evidence shows conclusively that, if indeed the coordinating principals are charged with these duties and responsibilities, their job will be far greater than that of a principal. Both Mr. James and Mr. Williams agreed that if they are actually permitted to assume these responsibilities in a meaningful way, the position of coordinating principal would be most challenging and would be excellent training for a central staff position, which, of course, they both agree would certainly be a promotion over the position of principal. Their complaint is, though, that as of the date of the hearing they had not been assigned the duties listed nor charged with the responsibilities contained in Circular No. 38. They complain that as of the time of the hearing their new assignment had been practically meaningless, and that as such, they felt that they had been "demoted."

There can be no doubt but that if Mr. James and Mr. Williams were to be required to continue in the job of coordinating principal under the same circumstances in which they found themselves at the time of this hearing, the conclusion would be inescapable that they had been "demoted." But the evidence does not justify the conclusion that such will be the case.

Due to the turmoil created by the Court's order advancing the deadline for complete desegregation to February 1, 1970, from the original deadline of September 1970, the school board did not have sufficient time to delineate the duties and responsibilities of the newly appointed coordinating principals until March 23, 1970. On that date, Circular No. 38 was issued by the School Board setting out in detail the duties and responsibilities of the coordinating principals. The hearing in this case was held on April 6, 1970, or only fourteen days after the new positions had been defined. Consequently, it is quite obvious that the full meaning of these new positions had not become manifest by the time this hearing was held. Mr. James testified that it was his impression that this new job would bring him closer to the central staff office and that in all probability he would ultimately be moved into the central staff office which he would consider to be a promotion.

Mr. Williams testified as follows:

"Q. Is it your understanding or do you view the job as coordinator as a demotion from your prior job?

A. Well, let us put it like this. Prior to this list of duties, some fourteen in number that was released at the time I mentioned, the job as related to these duties now could be very meaningful. Prior to the release of these fourteen guidelines, then I would say it was nothing but more or less a subterfuge; but I think to do all of those fourteen things would certainly keep you busy; but remember this came late."

There is no question but that both Mr. James and Mr. Williams would have preferred to remain in their positions as principals rather than to have been reassigned to these new positions if the new positions were no more meaningful than they were at the time of this hearing. But there is also no doubt but that these newly created positions, in light of the duties and responsibilities as outlined in the School Board's Circular No. 38 cannot, at this time, be considered to be "demotions" prohibited by the prior orders of this Court. Under the Court of Appeals mandate, willingness to be reassigned from one school to another and from one job to another is now made a condition of continued employment insofar as teachers and staff personnel are concerned. The only requirement is that such reassignment or transfer must not violate the "demotion" provision of the Court order which has been quoted hereinbefore. The fact that a teacher does not particularly like his reassignment is apparently of no moment provided the reassignment does not violate the letter or the spirit of the Court-ordered plan under which the schools are being operated.

The evidence in this case shows that the School Board has been grappling with the problem of desegregation for a long time. They have pursued many avenues in search of means and methods of bringing about complete desegregation in accordance with Court orders with as little disruption to the school system as possible. The idea of creating positions of coordinating principals was considered for at least a two-year period by the School Board and these new positions were discussed with both Mr. James and Mr. Williams at least six months before the jobs were created. During the course of the hearing before this Court, Mr. James D. Prescott was called to testify. Mr. Prescott is the Executive Secretary of the Louisiana School Boards Association and holds two degrees in education and has almost completed his work on his doctor's degree. Mr. Prescott was asked whether or not in his opinion, these newly created jobs amounted to "demotions." His answer was:

> "Regardless of who would fill the positions, as outlined on this sheet, the duties and responsibilities carried top-level supervisory and administrative responsibilities. There is no question in my judgment but that the positions, regardless of the title, having the duties and responsibilities listed here in these positions have to (sic) top level administrative or supervisory positions. And in my judgment they are beyond that required for a principalship or anything less than that. I don't know whether this is the proper time to point this out, Mr. Ward, but because of the difficulties in desegregating school systems, a good many school boards and superintendents are now creating new kinds of administrative and supervisory positions.

In this case, I think that is what this is, and in this case we have coordinating principals. In some other parishes, different titles are given, but one problem that has repeatedly occurred throughout the state is that the complexity of the educational problems which are resulting from desegregation

plans now being implemented require that much greater and closer attention be given to the instructional programs of the schools, and less attention to managerial details.

Now, the principalships up to now have carried both of these responsibilities. We have said for a number of years that most of the job of the principal is that of supervising the instructional program, and this is so, except that as a matter of fact he simply does not have the time to do this, because he is engaged in managerial details.

Thus new positions are now being created by school boards in order to provide greater attention to the instructional programs; and in this case, Mr. Distefano called these coordinating principals. In Caddo, for example, they are just coordinators; and they are in the process of perhaps setting up hundreds of those."

And then, in answer to a question of whether or not these positions had been attacked as "demotions" by anyone else to his knowledge, Mr. Prescott said:

> "No, sir, no one that I know of, in the creation of those, regarded them as being anything less than as I said earlier, top-level administrative and supervisory positions. More nearly supervisory than administrative, but in all those cases they are without question in my judgment above the principalship. I would say they are closer to the central staff type position than the principalship."

Dr. D. G. Joseph, Dean of Education at Nicholls State College, evaluated these positions as follows:

> "Q. In your opinion as a professional educator and administrator, does the organization as proposed and implemented by Superintendent Distefano indicate to you whether these two positions of coordinating principal carry greater responsibility, a greater degree of skill than would the position of principal at a single school

or are they the same or are they less?

A. I would say they were much more from what he outlined as the duties and responsibilities. As I have seen them, I think the duties are quite important, very important; and I think that there is a tremendous opportunity there for a lot of good in education that this person could perform."

And then Dr. Carey W. Eubanks, head of the Department of Psychology for Education at Nicholls State College, testified:

"Q. In your professional opinion do those duties and responsibilities listed there for the position of coordinating principal indicate to you that this position is above, below, or equal to that of principal of a single, say, high school?

A. In my opinion this is equal to or greater than that of principal of a single high school, based on the statement of duties and responsibilities.

Q. And in your professional opinion, Dr. Eubanks, is there any way that this position could be considered a demotion by a person who has been serving as principal of a single high school?

A. I can't see now how it could be considered a demotion."

And finally, the evidence must be considered in light of the obvious intention of the School Board at the time these positions were created. Mr. Sam Distefano, Superintendent of Iberville Parish Schools, testified at length as to the research, planning, and final implementation of the board's plan to create the office of coordinating principal. After explaining what he considered to be the need for these positions, he was asked:

"Q. In your opinion as an educator, administrator, and superintendent, are these two positions which we are considering here today of coordinating principal, do they have greater responsibilities and require greater skill than do the job of principal of an individual school?

A. Yes, sir, they do.

Q. Do you consider them a promotion?

A. Yes, sir, I do.

\*    \*    \*    \*    \*    \*

Q. Whom do you expect to be over whom? The coordinating principal or the principal?

A. The coordinating principal.

Q. He is going to have greater responsibility than a principal?

A. Yes, sir.

Q. In other words, the principal is going to have to answer to the coordinating principal?

A. Yes, sir.

Q. Under this, and in accordance with this list of duties and responsibilities?

A. Yes, sir.

Q. Is there any plan made for an increase in salary for these two gentlemen?

A. Yes, sir, very definitely. At the time I discussed it with several members of the School Board and they insisted that they give them salary increases right then and there, and I specifically asked the Board not to do it because we were having trouble getting our children in school, and our principal's salary is based on the number of children we have in school, plus experience, plus degrees, and so forth. But the number of children is the foundation for it, and we didn't want the coordinators to make more money than the supervisors that are over the entire parish; and we have four of those. Then we would have a morale problem there if we would have increased our coordinating principals who would have lesser duties than the parish-wide supervisors; but

definitely the School Board informally had instructed me to work on the salary schedule increasing these coordinating principals, yes, sir. It would have been done if we had had sufficient time to work on education rather than on other problems that are entirely new to me."

\* \* \* \* \* \*

May I take the liberty of just reading something from the official minutes relating to the question you asked me? \* \* \* The official minutes of June 29, this is a report that I gave to them on setting up this coordination and this is just one paragraph.

'Actually what we have in mind,—' And when I say 'we' I mean the central staff and myself, because they assisted me in this set up.

'Actually what we have in mind is to recommend running schools as units in certain areas, though the children will be in different buildings. We will recommend the employment of coordinators to be over two or three schools and they will plan the instruction and activities of children in all the schools in this area.'

And when I say to 'be over' that is what I meant to be 'over the principal' in that particular school, and that is increased responsibility because definitely any time you take on more than one school, that requires more skill and more responsibility."

The evidence in this case further preponderates in favor of the conclusion that Mr. James and Mr. Williams were selected for these newly created positions not because of their race but because of their superior qualifications to fill the job. One of the prime requisites, in the opinion of the School Board, was that the persons selected for these new positions be persons who related well to members of both the white and Negro race, and who had the experience and background to adequately take on these duties and responsibilities. In being questioned concerning the selection of

Mr. James and Mr. Williams for these positions Mr. Distefano testified as follows:

"Q. And in considering personnel to fill these two positions, how many different people in your system did you consider?

A. About seven or eight.

Q. Could you give me their names and what positions they are holding?

A. I considered Mr. Harold J. Raymond, principal of Plaquemine High School; Frank Ferachi, assistant principal of Plaquemine High School at that time; William Ishem, who was—

Q. Would you also give the race of each of those persons as you give their names?

A. Mr. Raymond and Mr. Ferachi are white; Mr. Ishem was black.

Q. And what is his position?

A. He is business manager at Plaquemine High School.

Ollie Scott, who is head coach and teacher at Iberville High School and was assisting us in the administration at Iberville High School.

Mr. Archie Gauthier who was assisting in administration and teacher at the St. Gabriel High School. Mr. Bernie Becnel who is principal of St. Gabriel High School. John McCray, who was assistant principal at Iberville High School. Mr. James and Mr. Williams.

Q. Did most or all of those personnel possess the basic qualifications that you were looking for for this job?

A. Yes, except Mr. McCray; and he was on sabbatical leave to further certify himself, and we didn't give him too much consideration.

Q. Was one consideration in your selection of Mr. James and Mr.

Williams, among these other candidates, their already exhibited ability to work well with members of both races?

A. Yes, sir.

Q. Did you feel that the ability to work well and communicate with both races was extremely important at this time?

A. Yes, sir, very important."

And at the conclusion of the hearing in this case, it was stipulated between counsel for both the plaintiff and the defendant, that if each of these persons who had been considered for these jobs were called to testify they would all testify that they considered the job of coordinating principal to be a promotion over that of principal and that they would have accepted the job had it been offered to them.

While the Court is aware of the truth in the contention of counsel for the plaintiff that a person can be called a "maintenance engineer," but still be, for all practical purposes, a plain old "janitor," nevertheless, it is the opinion of this Court that the School Board of Iberville Parish is in the utmost good faith in its creation of these positions of coordinating principal, and that these positions are, and will in the future, be definite promotions over the position of principal of a single school. Unfortunately, the School Board was "caught in a squeeze" by the Court's order advancing the deadline for total desegregation of its school system. The application of plain common sense leads to the conclusion that it was practically impossible, under the existing circumstances, for the School Board to have provided for the complete implementation of these two new jobs in the short time allowed them by the Court order ordering complete desegregation by February 1, 1970.

The testimony presented to this Court induces the belief that these jobs are meaningful jobs and that they are greater in importance than the job of principal of a single school. Mr. Distefano has testified under oath that the duties and responsibilities listed in Circular No. 38 will in fact be given to the occupants of these positions and he has testified, under oath, that it is the intention of the School Board to place these "coordinating principals" over the principals of the schools involved and that it is the intention of the School Board to increase their salary commensurate with the added duties and responsibilities assumed. It is also his testimony, under oath, that it is the intention of the School Board that these jobs be "stepping stones" to central staff positions if such be available in the future. We have no reason to question the integrity of Mr. Distefano nor of the School Board for whom he speaks. The full impact of these new positions simply had not had time to manifest itself by the time this hearing was held.

It is the opinion of this Court that Mr. James and Mr. Williams were not "demoted," and that the School Board has not in any way violated the demotion provision of the Court order under which the school system is being operated. It is the opinion of this Court that reassignment from principal of a single school to the position of coordinating principal is intended to be a promotion rather than a demotion and that it is incumbent upon the plaintiffs to accept these reassignments as a condition to their continued employment. However, in order that there be no misunderstanding of any kind, it is also the opinion of this Court that if, in fact, the duties and responsibilities outlined in Circular No. 38 are not actually given to the occupants of these positions, and that if these positions do not develop in accordance with the intentions of Mr. Distefano and the Iberville Parish School Board, this Court would have no hesitancy, if such a showing be made in the future, in ordering that these plaintiffs be restored to their prior positions. This opinion, denying the demands of Mr. Williams and Mr. James for reinstatement to their positions as principal of single schools, is predicated upon the belief that the evidence in this case shows that it is the intention of the School

Board to grant to these plaintiffs, as coordinating principals, duties and responsibilities substantially above the roles exercised by the principals of the individual schools involved. Should it develop during the time between now and the end of the first semester of the 1970–71 school year that these assumptions are incorrect, plaintiffs will have the right, of course, to file a new suit in this Court again questioning the validity of these reassignments.

For these reasons, the demands of the plaintiffs to be reinstated in their former positions of principals will be denied and judgment will be entered accordingly.